NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
**KOLESAR & LEATHAM, CHTD.**
3320 W. Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
E-Mail: nleatham@klnevada.com
         ncox@klnevada.com

Attorneys for Creditor
NEVADA STATE BANK

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| IN RE: | Case No. 09-22234-MKN |
|---|---|
| WALL STREET NEVADA, LLC, | Chapter 11 |
| Debtor(s). | Hearing Date: November 10, 2009<br>Hearing Time: 2:00 p.m. |

**SECURED CREDITOR NEVADA STATE BANK'S OPPOSITION TO THE DEBTOR-IN-POSSESSION'S MOTION FOR ORDER: (1) APPROVING ADEQUACY OF DISCLOSURES IN PROPOSED DISCLOSURE STATEMENT AND (2) SETTING A CONFIRMATION HEARING, RECORD DATE AND DEADLINES FOR BALLOTING AND OPPOSITIONS TO CONFIRMATION**

Secured creditor, Nevada State Bank (the "Bank"), by and through its attorneys of the law firm of Kolesar & Leatham, Chtd., hereby objects to the Debtor-in-Possession, Wall Street Nevada, LLC's ("Debtor") Motion for Order: (1) Approving Adequacy of Disclosures in Proposed Disclosure Statement and (2) Setting a Confirmation Hearing, Record Date and Deadlines for Balloting and Oppositions to Confirmation as follows:[1]

. . .

. . .

. . .

---

[1] This Opposition is supported by the Declaration of Pier Martin, filed concurrently herewith and referenced herein as the "Martin Declaration."

626701.doc (3268-8)                                      - 1 -

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

The Court should disapprove the Debtor's Disclosure Statement as it fails to provide adequate information to allow the Bank to make determinations about the viability of the proposed plan. Specifically, the Debtor's Disclosure Statement reveals the Debtor's plan to fund full payment of its creditors from a potential recovery in an inverse condemnation lawsuit. The Debtor's Disclosure Statement is inadequate, however, since it includes nothing more than mere speculation as to the viability of its inverse condemnation litigation without addressing adverse facts or controlling law which would seem to diminish, if not, completely prevent recovery on its inverse condemnation claim. As a result of Debtor's failure to provide a more specific analysis of its inverse condemnation claims, the Bank cannot adequately determine the viability of the lawsuit and therefore the value of the Debtor's allegedly most valuable asset. Accordingly, this Court should disapprove of the Debtor's Disclosure Statement.

In addition, the Court should disapprove the Debtor's Disclosure Statement because it includes an impermissible proposal to enjoin the Bank from pursuing guarantors, David M. Frank, Craig Katchen, David M. Frank 2004 Revocable Inter Vivos Trust and Craig Katchen Revocable Trust No. 1 until the inverse condemnation litigation is finalized. While generally, an opposition to such a proposal is more appropriately made at the confirmation stage, because the inclusion of such a term would make confirmation impossible, the Court may consider such proposed terms at the approval of the Disclosure Statement stage and should disapprove the Disclosure Statement accordingly.

### II.  STATEMENT OF FACTS

1. On July 10, 2009, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. On October 7, 2009, Debtor filed a Disclosure Statement which identifies the Debtor's pre-petition inverse condemnation litigation (the "Litigation") as the "key to recovery for all parties." *See* the Disclosure Statement [dkt. 30], pg. 17, ln. 6.

. . .

626701.doc (3268-8)

- 2 -

3. The Bank's secured interest arises from the February 20, 2006 Loan Agreement (the "Agreement") and Promissory Note (the "Note") entered into between the Bank and the Debtor for the purchase of the Property and additional parcel(s) and certain pre-development costs. *See* a copy of the Agreement and the Note attached as Exhibits A and B, respectively to the Martin Declaration.

4. Pursuant to the terms of the Note, the Debtor agreed to pay the Bank the principal amount of Fifteen Million Seven Hundred Fifty-Seven Thousand One Hundred Eighty-One Dollars ($15,757,181), together with interest on the unpaid outstanding balance at the variable interest rate set forth therein. *See id.* at Exhibit B.

5. The Note required the Debtor to pay regular monthly payments of all accrued unpaid interest due as of each payment, beginning March, 2006, with all subsequent interest payments to be due on the same day of each month thereafter, with a final payment of all outstanding principal plus accrued unpaid interest on September 20, 2007 or as extended.[2] *See id.*

6. To secure repayment of the indebtedness and obligations evidenced by the Agreement and Note, the Debtor executed various Deeds of Trust in favor of the Bank which the Bank recorded in the Official Records, Clark County Nevada on the real property which is the subject of the Debtor's Litigation (the "Property"). *See* copies of the various Deeds attached to the Martin Declaration as Exhibit C.

7. On February 20, 2009, David M. Frank, Craig Katchen, David M Frank 2004 2004 Revoable Inter Vivos Trust and Craig Katchen Revocable Trust No 1 entered into a Continuing Guaranty ("Guaranty") guaranteeing the Debtor's performance under the Agreement and Note and all other related loan documents. *See* a copy of the Guaranty attached as Exhibit D to the Martin Declaration.

. . .

. . .

---

[2] The Note contemplated 2 six month optional extensions.

626701.doc (3268-8)                                                - 3 -

8. The Debtor is in default under the Agreement, Note and the Deeds of Trust including all modifications and all other loan documents entered into in connection with the loan (collectively, the "Loan Documents"). *See* the Martin Declaration.

9. The Bank cannot adequately evaluate the Debtor's representations regarding the value of its inverse condemnation litigation and therefore determine whether to disapprove of the plan from Debtor's description of the same in its Disclosure Statement. *See* the Martin Declaration.

### III. DEBTOR'S DISCLOSURE STATEMENT IS FATALLY FLAWED.

In its' Disclosure Statement and proposed Chapter 11 Plan of Reorganization, the Debtor proposes to pay all creditors out of the proceeds it may recover in an inverse condemnation action. *See* Disclosure Statement [dkt. no. 30], pg. 4, lns. 14-16, lns. 23-25, pgs. 22-25; *see also* the Debtor's Proposed Plan of Reorganization, Exhibit A to the Disclosure Statement. However, as set forth below, the Disclosure Statement lacks the specificity necessary for the Bank to make an informed judgment about the viability of the inverse condemnation action and the plan whose viability is premised entirely on the success of that action.

Section 1125(b) of the Bankruptcy Code provides that:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title ..., unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

*See* 11 U.S.C. § 1125(b). Section 1125(a)(1) defines "adequate information" as:

> ... information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan,...

*See* 11 U.S.C. § 1125(a)(1). According to the legislative history, the parameters of what constitutes adequate information are intended to be flexible:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a

626701.doc (3268-8)

- 4 -

> practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection. There will be a balancing of interests in each case. In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.

*See* 1978 U.S.C.C.A.N. 5787, 6365. Local Bankruptcy Rule 3017 further refines the requirements of a Disclosure Statement, mandating that

> The disclosure statement should include, at a minimum:
>
> (1) A statement regarding the debtor's background, ownership, and prebankruptcy operating and financial history;
> (2) A discussion of the reason for the bankruptcy filing;
> (3) A summary of proceedings to date in the bankruptcy case;
> (4) A summary of assets;
> (5) A description of unclassified claims, including estimated amounts of administrative and priority claims;
> (6) A description of claims by class, including an estimate of the amount of claims in each class as reflected by the schedules and proofs of claim on file;
> (7) A summary of the treatment of unclassified and classified claims under the proposed plan;
> (8) A summary of the treatment of executory contracts under the proposed plan;
> (9) A liquidation analysis;
> (10) A statement explaining how the proponent intends to make the proposed payments; and
> (11) The disclosures required by 11 U.S.C. § 1129(a)(5).

LR 3017(d).

The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan. *In re California Fidelity, Inc.*, 198 B.R. 567, 571 (9th Cir. BAP 1996) ("The purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan."). The vetting process of a disclosure statement and plan should also serve to prevent confirmation of visionary schemes with little likelihood of success. *See* 11 U.S.C. § 1129(a)(11); *see also In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002); *see also In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage that could otherwise be raised at confirmation, if the described plan

is fatally flawed so that confirmation would not be possible. *See In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed."). As one Court explained:

> If the disclosure statement describes a plan that is so "fatally flawed" that confirmation is "impossible," the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.

*In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001)(citations omitted). Thus, although the question whether a plan meets requirements for confirmation is usually answered at the plan confirmation hearing, the Disclosure Statement may be disapproved at this threshold stage if the Debtor's proposed Plan is facially unconfirmable, as is the case here.

### A. The Disclosure Statement Fails To Provide Adequate Information Regarding The Available Assets And Their Value.

Adequate information in a disclosure statement should include a description of the available assets and their value. *See Westland Oil Development Corp. v. MCorp Management Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993). Generally, "[i]t is not necessary to the adequate information standard that a disclosure statement specifically speculate as to future uncertainties such as the consequences of various possible outcomes of pending, let alone hypothetical, litigation." *In re Aspen Limousine Service, Inc.*, 193 B.R. 325, 335 (D. Colo. 1996). By contrast, however, such specificity about the consequences of pending litigation is required where the plan relies on the recovery from such actions to fund 100% of the payment to creditors. *See id. See also In re Made in Detroit, Inc.*, 299 B.R. 170 (Bankr. E.D. Mich. 2003)(finding "[w]hile Debtor in this case is sincere, honest, and willing, the Debtor's Plan of Reorganization is not realistic, as it does not provide a reasonable assurance of success. The Plan is based on "wishful thinking" and "visionary promises.").

. . .

Here, as set forth in *In re Aspen Limousine Service, Inc.*, because the Debtor's Plan relies on the recovery resulting from litigation to fund 100% payment to creditors, the Debtor must provide in its Disclosure Statement more than mere speculation as to the viability of its inverse condemnation claims. However, as it stands, the Debtor's Disclosure Statement lacks the requisite specificity *In re Aspen Limousine Service, Inc.* demands, and is nothing more than the "wishful thinking" the Court recognized in *In re Made in Detroit, Inc.* as being insufficient to confirm the debtor's plan. This Court should disapprove Debtor's Disclosure accordingly.

The flaw in the Debtor's explanation of the possible outcomes of the litigation is that it does not acknowledge, let alone distinguish, controlling Nevada law which would seem to diminish, if not, completely prevent recovery on its inverse condemnation action. For example, pursuant to the Nevada Supreme Court, "[i]t is well-established that the mere planning of a project is insufficient to constitute a taking for which an inverse condemnation action will lie. *Sproul Homes of Nevada v. State ex rel. Dept. of Highways*, 96 Nev. 441, 443-444, 611 P.2d 620, 621 (1980) (relying on *Selby Realty Co. v. City of San Buenaventura*, 169 Cal.Rptr. 799, 514 P.2d 111, 116 (1973); *Bakken v. State*, 142 Mont. 166, 382 P.2d 550, 551-52 (1963); *City of Buffalo v. J. W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895, 904 (1971); *Thurow v. City of Dallas*, 499 S.W.2d 347, 348 (Tex.Civ.App. 1973)). In upholding the dismissal of the *Sproul* Complaint for inverse condemnation, the Court noted that the deficiencies with the Complaint were that there was no allegation that appellant's property will definitely be acquired for highway purposes, nor did it allege that the government had placed any legal or physical obstacles in the path of Sproul in its use of the land. 96 Nev. at 445, 611 P.2d at 622. Moreover, among other things, the Court found fault with the fact that the appellant had failed to allege dates of claimed governmental activities. *See id.*

Here, like *Sproul*, the Debtor's explanation of the underlying factual basis for its inverse condemnation action appears similarly deficient. In its Disclosure Statement, the Debtor merely concludes that "[b]ut the Nevada Department of Transportation ("NDOT") prevented development by announcing its Project NEON which required the bisection of the Debtor's Real Property for roadways leaving approximately 5.30 net acres." *See* Disclosure Statement [dkt. no.

30], pg. 4, lns. 7-9. The Debtor continues on to say that "[t]he Debtor was aware of Project Neon prior to its purchase of the Real Property. After NDOT significantly changed its plans for Project Neon, which changes significantly changed the portion of the Real Property required by Project Neon, the Real Property's value became uncertain due to the various possible routs of on-ramps and access roads that were under consideration by NDOT." *See id.* at pg. 9, lns. 19-22. Finally, the Debtor explains:

> NDOT originally gave notice to the Debtor that only a very small portion of the Real Property would be taken for the construction of Project Neon (air rights only along the southeasterly portion of the real property), a public use project that will require the taking of numerous properties by eminent domain and the expansion and construction of I-15 and several flyovers, auxiliary, and collector streets. The Debtor designed its project around the proposed NDOT plans. After the Debtor expended the time and money designing its project and obtaining entitlements to build its project, subsequently, NDOT representatives provided the Debtor's representative with a map which shows construction of Project Neon will occur directly through the approximate center of the Real Property and that part or all of the Real Property will be taken. NDOT provided a map which shows the construction of Project Neon directly through the approximate center of the Real Property. A copy of that map is attached hereto as Exhibit "D-2." A clearer map of the proposed Project Neon, is attached as Exhibit "D-3."
>
> More information about Project Neon can be found at http://www.ndotprojectneon.com/home.html.
>
> In furtherance of Project Neon, NDOT has completed a draft environmental impact statement, which is a lengthy and detailed process, which shows the taking of part or all of the Real Property for the construction of Project Neon. NDOTs draft environmental impact statement includes different alternatives for the construction of Project Neon through the Real Property. However, of the alternatives which are now considered the preferred alternatives show the taking of a substantial swath of the center of the Real Property. This draft environmental impact statement was prepared by and made public by NDOT. At no time has NDOT given the Debtor exactly which portions of the Real Property will be taken for Project Neon leaving the Debtor and any prospective buyers or lenders in doubt as to what property will be available for development.

*Id.* at pg. 15, lns. 3-25.

It appears from these explanations that the Debtor concedes that Project NEON is still in the planning stage, and that despite any legal or physical obstacles Project NEON has placed on its use of the Property, the property is still worth well over $2 million. *See* the Disclosure Statement at pg. 10, lns. 18-26, pg. 11, lns. 1-9 (citing from Exhibit C). Moreover, as in *Sproul*,

glaringly absent from the Debtor's explanation of the underlying facts of its case are the pertinent dates of NDOT's activities- - in particular, when the Debtor knew or should have known of Project NEON and its alleged plans for the Property. Under *Sproul* such concessions and lack of specificity would likely result in the dismissal of the Debtor's inverse condemnation claims.

The Debtor does not address *Sproul* or any other potentially negative facts or law which could impact the viability of its claim. As previously noted herein, because the Debtor's plan relies on a recovery resulting from its inverse condemnation litigation to fund 100% payment to creditors, it must provide enough information for the Bank to determine the value of such litigation. Notwithstanding this requirement, however, the Debtor has made no effort to identify or counter any binding legal authority such as *Sproul* which appears contrary to its claims, and which may have significant impact on its case and thus the valuation of its largest asset. This deficiency requires the Court's disapproval of the disclosure statement and ultimately the Debtor's Plan of Reorganization.

**B.     The Disclosure Statement Reveals That The Plan Is Fatally Flawed Because It Seeks An Impermissible Injunction Against Non-Debtor Third Parties Beyond the Confirmation of a Plan of Reorganization.**

This Court should also disapprove the Debtor's Disclosure Statement because the information it reveals makes it evident that the Debtor's proposed Plan seeks to enjoin a creditor beyond confirmation of a reorganization plan, in violation of well-settled Ninth Circuit precedent. It is well established in the Ninth Circuit that a bankruptcy court lacks jurisdiction and power to enjoin a creditor from enforcing its rights against non-debtor third parties beyond confirmation of a reorganization plan. *See In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 615 (9th Cir. BAP 1990); *American Hardwoods, Inc. v. Deutsche Credit Corp.*, 885 F.2d 621 (9th Cir. 1989).

Here, the Debtor's Disclosure Statement specifically declares that "Nevada State Bank will be temporarily enjoined from pursuing guarantees of David M. Frank, Craig Katchen, David M Frank 2004 2004 Revocable Inter Vivos Trust and Craig Kitchen [sic] Revocable Trust No 1 ***until the litigation is final.***" Disclosure Statement, pg. 24, lns. 8-12 (emphasis added); *see also*

Disclosure Statement, pg. 33, lns. 8-11. Under usual circumstances, one can expect the Debtor's inverse condemnation action to last for several years. In fact, the Defendant State of Nevada has not yet even filed its initial responsive pleading. Thus, the Debtor's plan to enjoin the Bank's efforts in pursuing its rights under the Guaranty will undoubtedly extend beyond confirmation of its Plan of Reorganization, in direct violation of *In re Rohnert Park Auto Parts, Inc.* Since the inclusion of this term would make confirmation impossible, the Court should disapprove the disclosure statement.

## IV.

## CONCLUSION

The Disclosure Statement reveals that the Debtor's Plan involves nothing more than a series of contingencies, lacks the adequate information required to allow for a reasonable creditor to make an informed determination regarding the proposed plan and includes proposed terms which would make confirmation of Debtor's Plan of Reorganization impossible. Consequently, the Bank respectfully requests that this Court disapprove of the Debtor's Disclosure Statement.

DATED this 2nd day of November, 2009.

**KOLESAR & LEATHAM, CHTD.**

By: /s/ Natalie M. Cox
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
3320 W. Sahara Avenue, Suite 380
Las Vegas, Nevada 89102

Attorneys for Creditor
NEVADA STATE BANK

626701.doc (3268-8)

- 10 -